W. A. TROTTER, Administrator, *v.* E. L. TROTTER *et al.*

1. EXECUTORS AND ADMINISTRATORS: INTEREST, HOW CALCULATED.—It is erroneous for executors and administrators to charge themselves with the interest on all sums received, and to credit themselves with the interest on sums paid out, the interest being calculated to the date of final settlement.

2. EXECUTORS AND ADMINISTRATORS: ENTITLED TO CREDIT FOR INTEREST PAID.—An executor or administrator is entitled to credit for amount actually paid as interest on debts against the estate.

3. EXECUTORS AND ADMINISTRATORS. STATUTE OF LIMITATIONS.—Executors and administrators are not entitled to credit for claims paid by them, that were barred by the statute of limitations anterior to the grant of administration. *Byrd* v. *Wells.*

4. EXECUTORS AND ADMINISTRATORS: CONFEDERATE MONEY.—Executors and administrators are entitled to credit for Confederate money received by them on account of sales of personal property made by order of the Probate Court during the war, and which they retained in their hands until after the surrender, for the purpose of paying the taxes of the estate for the year 1865.

5. EXECUTORS AND ADMINISTRATORS: CONFEDERATE MONEY AND CONFEDERATE BONDS: VALIDITY OF ACT OF 2D AUGUST, 1861, AUTHORIZING INVESTMENTS BY TRUSTEES.—The act of the legislature of August 2, 1861, authorizing executors and administrators and other trustees to invest money or effects, liable to

Trotter *v.* Trotter et al.

be invested at interest, in bonds or treasury notes issued since the 9th of January, 1861, by authority of the State of Mississippi or Confederate States, was, at the time of its passage, a valid and binding law: and for investments so made, executors, administrators, and other trustees will be entitled to credit.

6. EXECUTORS AND ADMINISTRATORS: WHEN AND HOW LIABLE FOR RENT OF LAND.— Executors and administrators are not liable for the rent of land, cultivated by them with the assent of the heirs, and without an order of the Probate Court. If worked without the consent of the heirs, and without an order of court, they are not amenable therefor to the Probate Court, but liable, if at all, to the heirs to whom the lands descended upon the death of the ancestor.

7. PROBATE COURT: POWER TO COMPEL ADMINISTRATOR TO MAKE RETURNS CONFORMABLE TO THE VIEWS OF THE COURT.—The Probate Court has no power to compel an administrator to conform his returns, made under oath, to the views of the court. It is the administrator's duty to make returns, and the duty of the court to judge their effect.

APPEAL from the Probate Court of Clarke county.   Hon. C. A. Storall, judge.

*Fulton Anderson,* for appellant.

*David C. Glenn,* for appellees.

HARRIS, J., delivered the opinion of the court.

The appellees filed their petition in the Probate Court of Clarke county, praying distribution of the estate of W. B. Trotter, deceased.

To this petition the administrator filed his original and amended answer, and, upon final hearing, a decree was rendered against the administrator in favor of petitioners.

The first objection urged by counsel for appellant to this decree is, that the court below refused to allow the administrator a credit for *interest* on notes, etc., past due, against the decedent, which was *paid by him* after their maturity.

It seems from the account presented that the administrator charged himself with interest on all sums received, and gave himself credit for all claims paid, with interest thereon, both debits and credits, to the date of settlement, in 1866. This mode of calculation the court properly rejected; but in doing so, by its decree, the court also rejected, in some cases, amounts of *interest* on debts against the intestate which were actually

45

*paid* by the administrator as a part of the debt.    This was erroneous.    It was as much the duty of the administrator to pay the *interest*, legally due, on claims against the estate at the time of their payment, as to pay the principal, and he was equally entitled to credit therefor.    But when paid, the claim became extinguished, and could no longer bear interest in the hands of the administrator, as a debt or claim against the estate.

The next objection to the decree of the court is, that it disallowed the claim of $745.00 paid Ward, voucher No. 4 of second class.    This was a sum of money collected by the intestate in his lifetime, as an attorney-at-law, in February and August, 1858, and was paid by the administrator in February, 1866.    It is urged in favor of the disallowance that this claim was barred by the statute of limitations of three years (Code, article 5, page 400); while it is insisted by appellant, that it appearing by the evidence of Ward that he held a receipt of the intestate for these notes, which was destroyed during the war by the Federal soldiers, that this must be regarded as the foundation of the claim paid by the administrator, and this receipt is only barred by the limitation of six years prescribed in the same act.

The claims here presented is an open account, stated, proven by the oath of Ward, examined, and allowed by the probate judge, and registered all *as an open account*, without any reference to any existing written or other contract in relation thereto. It must, therefore, be governed by the limitation of three years, applicable to open accounts.    In this view, the claims having been barred by the statute *anterior to the granting of administration* to appellant, according to the decision of this court in the case of *Byrd* v. *Wells*, at the present term, could not be legally paid by him, or allowed by the Probate Court in the settlement of his accounts.    This claim was therefore properly rejected.

The next ground of error complained of is that the court rejected voucher No. 38, for $840.00, Confederate money, received by the administrator on sale of personal property made by order of the Probate Court during the war, and reserved and held by

him to pay the taxes of the estate in 1865, which were not paid on account of the surrender. And also that the court rejected voucher No. 37, for $600, Confederate money, invested in four per cent. bonds of the Confederate States.

By the act of the legislature of the 2d August, 1861, (Session Acts, page 38,) executors, administrators, etc., were authorized to invest money or effects, liable to be invested at interest, in the bonds or treasury notes, issued since the 9th January, 1861, by authority of this State or of the Confederate States of America, etc.

By an act approved the 20th December, 1865, the legislature of this State provided, " That when any executor or administrator, etc., has heretofore received, on account of said estate, any Confederate money, etc., in due course of business, or in pursuance of the statutes of Mississippi at the time of receiving the same, and shall show, to the satisfaction of the court, that he has been unable to use any or all of said money, he shall only be chargeable with the real value of said money on hand, not used by him a saforesaid." Section 4, chapter 11, page 143, Acts of 1865.

The question now here is, whether the act of 1861, authorizing the investment of moneys or effects of the estate in bonds or treasury notes of the Confederate States, was a valid act at the time of its passage.

This grave question, growing out of the late civil war, has been virtually determined by the previous decisions of this court.

In the case of *Buck* v. *Swann*, decided at the April Term, 1866, this court held: "That the State of Mississippi is the same State that occupied its limits before the 9th January, 1861, and since that date. Its constitution and its laws are the same, except so far as they have been altered from time to time by its own act; rights of property are to be governed, contracts are to be construed, and crimes are to be tried and punished by the same laws that existed before the date of the act of secession, or that have been enacted since. It is not a new State or a new government, but the same State and the same government." * * *

In the case of *Hill et al.* v. *Boyland et al.*, decided at the October Term, 1866, this court held: "That all acts passed by the legislature of Mississippi during the war, not inconsistent with her organic law, were valid, and remained so afterwards, until altered or repealed by her authority; with the exception, that, upon the return of peace, all such acts as were inconsistent with the Constitution of the United States, or the laws passed in pursuance thereof, and *then existing*, were thereby annulled." And this conclusion is based on that opinion, upon the ground that, during the existence of the civil war, the authority of the United States Government was suspended; that the territory of Mississippi was not for the time a part of the United States; but over it the constitutional powers of the United States Government had been suspended by force of arms, and it was "enemy territory," where neither the person nor property of a loyal citizen of the United States, *residing there*, was entitled to the protection of her laws, or the cognizance of her courts, "because it was claimed and *held in possession* by an organized, hostile and belligerent power." The United States Government, for the time, had neither citizens, nor courts, nor laws, nor public policy, nor constitutional authority, as a matter of fact, in Mississippi.

In this opinion it is further said, in support of the conclusion first stated : " That protection and allegiance are mutual and reciprocal rights and duties between government and people, in their nature inseparable, is universally admitted; when the power of protection ceases, the duty of allegiance, its correlative, must cease with it. In a state of war, therefore, the citizen being compelled to submit for the time to the party having the possession and control of the territory in which he resides, he becomes subject to its dominion; his property and person are governed by its laws; and, without regard to the international strife, his *private rights*, under the municipal law to which he is thus subjected, must remain the same, no matter what may be the result of the struggle. His personal feelings and opinions are merged in his territorial *status*; and belonging to ' *enemy territory*,' he is to be regarded and treated by the

opposite power as an enemy, without the jurisdiction of its courts, and beyond the power and protection of its laws. The subsequent resumption of authority by the former sovereign cannot change the character of past transactions, or deprive the citizen of rights, vested under the laws of the territory while it was permanently occupied and governed by the enemy as their territory."

In the case of *Green* v. *Sizer*, decided by this court at the October Term, 1866, the whole court concurring in that opinion, except as to the mere *form* of the action, the same general views are sustained; and in express reference to Confederate notes, it is said : " These notes then stand on the footing of private property; and as well might it be said that specific private property in this State was not a sufficient consideration for a contract during the war, as to say that these notes, which were received without any illegal taint, could not form a valid consideration for a contract. For the private property of the citizens of the Confederate States was essentially the material resource on which the rebellion and the success of the whole cause depended. It was the source from which revenue, the sinews of war, was raised. It was impressed to supply military resources ; it was used in every way that the exigencies of the cause required for its purpose of civil and military finance ; and it was the basis on which the resources of the war absolutely rested. It was under the actual power of a subsisting government ; and whether rightful or wrongful is immaterial, since the citizen was compelled to submit to its authority. It was *in fact* the potential government which, for the time being, controlled his rights, his property, and his action. The same necessity and control gave rise to the existing circulating medium. The citizen was powerless to resist its operation. No one will contend that a contract during that period, founded on the sale of a piece of personal property, would be illegal, because it was founded on that which constituted a part of the material resource by which the rebellion was sustained ; and upon the same reason a contract, founded on that which was under the same exigency the representative of the property, cannot be illegal."

And it was here held that, as between our citizens in the course of business, obligations incurred on account of Confederate treasury notes, or of State currency issued during the recent war, are valid in law, and can be the foundation of legal rights.

In a very recent case in Alabama the precise question now before us, under a statute substantially like ours, providing, in 1861, that " all guardians may purchase bonds of the Confederate States for the estates they represent, and may receive in payment of debts due them treasury notes of the Confederate States," underwent a very elaborate and able examination, and the court then decided, " that, under the principles of law now pervading, guardians are justified in having yielded obedience, before the restoration of the authority of the United States, to the law above recited; and they are entitled to credit for money received and investments made before that time under such law." Chief-Justice Walker delivered the opinion of the court. *Watson and Wife* v. *Stone.*

We think, therefore, these sums should have been allowed, if the court was satisfied that they were received and invested, or held as stated.

The next ground of error insisted on is that the administrator is charged by the decree with the sum of $4,600 for rent of the land and hire of mules, and for provisions and use of farming utensils, in the year 1864.

It appears by the record that, in the years 1863 and 1865, the administrator worked the plantation under the order of the Probate Court, and continued to work it also in the year 1864, without any such order; and it is for this omission that he is sought here to be made liable, as upon an implied assumpsit.

In any view, he cannot be made liable for the rent of the land. If it was worked by the assent of the heirs, then they have no right to complain in this proceeding, and to charge him as for a wrongful act, with rent, etc., because he had obtained no order. If, on the contrary, the administrator carried on the business of the plantation without their consent, and without an order of court, he is not amenable therefor to the Probate Court, but is

liable, if at all, to the heirs to whom the land descended immediately on the death of the ancestor.

In regard to the personal estate with which it is sought to charge him on account of his working the plantation, taking the condition and history of the country into consideration, and looking at the testimony in this record, the decree is wholly unjustifiable on this point, and evidently proceeds upon a misapprehension of the facts before it.

The last ground insisted on is that the administrator is ordered by the decree to return to the next term of the Probate Court, a full and true statement of the crops of 1863 and 1865, with which he already stands charged in the accounts rendered, and upon which this decree is founded.

If there is error in those accounts, it was competent for the parties interested, in a proper proceeding before the Probate Court, to have the matter investigated, and to charge the administrator for any deficiency which they may prove. They may appeal to the conscience of the party, according to the rules of the Chancery Court; or on final account they may surcharge and falsify any annual or partial account or settlement. But this court cannot command the conscience of the administrator, so as to compel him to conform *his returns under oath* to the views of the court. It is for the administrator to *make returns;* the court *judges* their effect.

Let the decree of the court below be reversed, and cause remanded for further proceedings, in accordance with this opinion.