### HARLAN *v.* STATE, 41 Miss. R., 566.

#### LARCENY.

After the act of secession of 1861, the state of Mississippi was a government " *de facto et de jure ;*" its constitution and laws remained the same, except so far as altered by its own acts; rights of property are to be governed, contracts to be construed, and crimes to be tried and punished by the same laws that existed before the date of the act of secession, or that have been enacted since. Green v. Sizer, 40 Miss., 530; Hill v. Boylan, ib., 618.

The laws of the state of Mississippi, as they stood at the date of the ordinance of secession, continued in force afterwards, precisely as before, unaffected by that ordinance, or by the war, by the deposition of the state magistrates in May, 1865, or by their restoration in the fall of that year. Offenses against the criminal laws, committed during the war, or during the occupation of the state by the armed forces of the United States, are indictable and punishable now, as if these events had never occurred.

The jurisdiction over crimes, conferred by law upon the county courts, is not an exclusive jurisdiction, but concurrent with that of the circuit courts.

Error to Noxubee circuit court.   FOOTE, J.

*Jarnagin & Rives,* for plaintiff in error.

*C. E. Hooker,* attorney general.

ELLETT, J. :

An indictment was found on the fourth day of December, 1865, in the circuit court of Noxubee county, against the plain-

tiff in error, for the larceny of a gun, of the value of fifteen dollars, committed on the 30th day of May, A. D. 1865. After conviction, the accused moved in arrest of judgment, on the ground that, at the time of the commission of the offense, the constitution and laws of the state were suspended, or overthrown, and destroyed by the military power of the government of the United States, and that no such sovereignty then existed, or was recognized, as the state of Mississippi. This motion was overruled, and the accused was sentenced to three months' imprisonment in the county jail.

The question presented by the record is, whether on the 30th day of May, A. D. 1865, the state of Mississippi had any legal and valid existence as a state, and whether, if that inquiry be answered in the affirmative, the laws of the state for the punishment of crimes, in force prior to the ninth day of January, 1861, continued in force at the date of the commission of the offense charged, and whether the circuit court of Noxubee county had jurisdiction to try and punish the offense.

These questions have not before been presented to the court in this particular form, but every legal principle involved has already been carefully and deliberately examined and adjudicated by this court. In Swann v. Buck, we held that the state of Mississippi of to-day is the same state that occupied her limits before the ninth day of January, 1861, and since that date. "Its constitution and its laws are the same, except so far as they have been altered from time to time by its own act; rights of property are to be governed, contracts are to be construed, and crimes are to be tried and punished by the same laws that existed before the date of the act of secession, or that have been enacted since." In the case of Hill v. Boylan, the subject was investigated and treated more fully, and it was held that the existence of the state as a sovereign state *de jure et de facto* had never been interrupted or disturbed by the ordinance of secession, or by the progress or the events of the war which ensued, but, on the contrary, that all the functions of government—legislative, executive, and judicial—continued in full and rightful operation under the constitution and laws of the state. The immediate question in the case was, as to the right of the state

to pass laws during the continuance of the war, and it was held that such acts of legislation were valid and binding. The question was also directly involved, whether an act thus passed during the war continued in force after the cessation of hostilities, during the temporary suspension of the functions of the state authorities, consequent upon the occupation of our territory by the military forces of the federal government, and after the restoration of those functions in October, 1865, subsequent to the convention held in August of that year. And it was decided that the act was not only originally valid, but that it continued in operation through all the subsequent events, uninterrupted by the overthrow and displacement of the state officials and the hostile occupation of the state, or by the circumstances attending the subsequent reorganization. This proposition was necessarily true, whether we adopt the theory that prevailed at Washington during all the progress of the war, that the Union is indestructible, the ordinances of secession absolutely void, and that the seceding states never did or could cease to be states of the American Union; or the theory that has grown up since the return of peace, that such states are conquered territory, subject to the laws of war. In the former view of the question, no doubt could be raised whatever; and the latter is as free from real difficulty. For it is shown in the case last quoted, on the authority of approved writers upon public law, sanctioned by repeated decisions of the federal courts, that by the law of nations, the municipal laws of a ceded or conquered country, existing at the time of the cession or conquest, continue in force until altered by the new sovereign. See, on the same subject, the cases of Green v. Sizer, 40 Miss., 530, and Trotter v. Trotter, 40 Miss., 704.

It is unnecessary again to go into a general discussion of the subject. We entertain no doubt that the laws of the states, civil and criminal, as they stood at the date of the secession ordinance, continued in force afterwards, precisely as before, unaffected by that ordinance, or by the war, or by the deposition of the state magistrates in the month of May, 1865, or their restoration in the fall of that year; and that offenses

against the criminal laws, committed during the war, or during the occupation of the state by the army of the United States, are now liable to indictment and punishment, as if these events had never occurred. The laws themselves were not suspended during the administration of General Canby and Provisional Governor Sharkey, but only their administration was temporarily obstructed. Such a suspension of the active powers of government cannot be held to grant an unlimited license for the commission of crime, but, on the restoration of the proper functionaries, offenders may be held to their due accountability.

The indictment in this case was found on the 4th of December, 1865. Larceny, under the value of $25, was, by the Revised Code, a felony (page 604, article 191). By act of Nov. 24, 1865, p. 75, § 20, larceny, to a value not exceeding $100, is made a misdemeanor; and, by the third section of the same act, it is made a misdemeanor; and, by the third section of the same act, it is made cognizable by the county courts. This act went in force from its passage. These provisions took effect upon this offense, though it was committed before their adoption. The question then arises, whether the jurisdiction over crimes conferred by law upon the county court is an exclusive jurisdiction, or only concurrent with the circuit court. If exclusive, then the indictment in this case was void. Upon a careful consideration of the statute, we are satisfied that, although the county court is invested with "full and complete jurisdiction" over the cases enumerated, yet it was not intended that its criminal jurisdiction should exclude that of the circuit court over the same offenses. The circuit court already possessed the jurisdiction; and the fact that the same jurisdiction has been since bestowed upon another tribunal will not have the effect to deprive the circuit court of its jurisdiction, without some negative words indicating plainly such an intention. The jurisdiction is therefore concurrent.

The judgment of the court below will therefore be affirmed.