# OCTOBER TERM, 1866.

## J. and T. GREEN *v.* J. S. SIZER.

1. PLEADING AND PRACTICE: MONEY COUNTS: WHAT IS MONEY.—Money is that which passes as a medium of exchange, or the representative of value, and may be precious metals, chattels of intrinsic value, or that which, by common consent, is agreed on to represent value, and to pass from hand to hand as such, and in its character to be convertible into value.    Harris, J., dissenting.    Held—That depreciated bank notes were not money.

2. PLEADING AND PRACTICE: ACTION OF INDEBITATUS ASSUMPSIT MAY BE BROUGHT TO RECOVER THE VALUE OF " COTTON MONEY," " MISSISSIPPI TREASURY NOTES," AND " CONFEDERATE MONEY."—" Cotton money," " Confederate money," and "Mississippi treasury notes," are money, and an action of *indebitatus assumpsit* may be brought to recover their value from a banker, who has received them on special deposit, and who has refused to deliver them to the depositor on demand.    Harris, J., dissenting.    Held—That a receipt of the notes on special deposit, is equivalent to a refusal to receive and treat them as money, which is not negatived by the fact of their general circulation as currency; and that their value was not recoverable in an action of *indebitatus assumpsit.*

3. DEPRECIATED BANK NOTES: ACTION TO RECOVER: MEASURE OF DAMAGE.—In an action for money had and received to recover depreciated bank notes or other currency, ordinarily the amount of recovery is the value of the notes.

4. DEPRECIATED BANK NOTES: MEASURE OF RECOVERY WHERE PARTY UNJUSTLY REFUSES TO RETURN THEM.—Where depreciated bank notes are delivered by a debtor to a creditor, under an agreement to receive the same in part payment of a debt, provided a sufficient amount to satisfy the debt is subsequently paid, and the creditor fails to procure an amount of notes sufficient to satisfy the debt in full, and the creditor refuses to apply the amount received as a credit upon the debt, or return the same to the debtor, the creditor will be liable for the actual loss which the debtor sustained as the result of the detention.

5. CONTRACTS: ILLEGAL: LEGAL, WHEN UNCONNECTED WITH ILLEGAL ACT AND FOUNDED ON NEW CONSIDERATION.—A contract growing immediately out of, and connected with, an illegal act, will not be enforced; but where a promise is disconnected with the illegal act, and is founded on a new consideration, it is not tainted by the act, although it was known to the party to whom the promise was made, and although he was the contriver and conductor of the illegal act.

6. CONTRACTS: ILLEGAL: SALE OF THE SUBJECT OF AN ILLEGAL ACT, VALID WHEN.—After an illegal act is consummated, a subsequent sale of the subject of the illegal act, and a contract founded thereon, will be valid.

7. ILLEGAL CONTRACTS: CONFEDERATE MONEY: EXECUTORY CONTRACTS FOUNDED ON, MAY BE ENFORCED.—Executory contracts founded on the consideration of Confederate money and Mississippi treasury notes are valid.

8 BILLS OF CREDIT: CONSTITUTION OF UNITED STATES.—A contract executed by a
State, by which she binds herself at a future day to pay money for services ren-
dered, or money borrowed for present use, is not a bill of credit within the mean-
ing of the Constitution of the United States. 4 Peters, 431, 432.

9. BILLS OF CREDIT: "MISSISSIPPI TREASURY NOTES."—Mississippi treasury notes,
being issued by the State of Mississippi solely on the ground of a loan of money
to the State, are not bills of credit within the meaning of the Constitution of the
United States, and the fact that they were used by the people as currency does
not alter their character.

ERROR to the Circuit Court of Hinds county. Hon. John
Watts, judge.

The nature of the action, and the evidence, will be found in
the opinion of the court.

The fourth charge given for defendant in error, and referred
to in the opinion of the court, is thus :

That, if the jury believe that the treasury notes of the Con-
federate States, and those issued by the State of Mississippi,
were issued by governments which were established and in the
full exercise of their functions ; and that such governments pos-
sessed the power to enforce obedience to their laws, and capa-
ble for the time being of repelling the authority of all other
governments attempting to overcome them ; and further, that
such notes constituted the currency of the country, and were
received in the transaction of business, and possessed a value ;
any party appropriating them unlawfully, or without the con-
sent of the owner, is liable to pay the owner the value of such
notes at the time of their appropriation.

The second charge asked for plaintiffs in error, and refused
by the court, is as follows :

The notes or obligations of the belligerent power commonly
called the Confederate States, known as Confederate money,
being issued for the purpose of carrying on the civil war against
the United States, are absolutely null and void, and a deposit
of them by the plaintiff with the defendants does not constitute
a sufficient consideration to enable the plaintiff to recover of
the defendants in this action.

To the same effect were the first and third charges, asked for
plaintiffs in error, and refused by the court.

*D. Shelton* and *W. & J. R. Yerger*, for plaintiffs in error, contended,

1. That, if the Greens were liable to Sizer at all, it could only be in an action on the case for damages sustained by the refusal of the Greens to deliver the notes received on special deposit, or in trover for a conversion, which the refusal to deliver might amount to.

That the Confederate notes, Mississippi treasury notes, and cotton money are not money; they are choses in action. They were not received by the Greens as money, but on special deposit, to be paid as received. If the Greens had refused to deliver them on demand, they would have been responsible for their value in the proper form of action for damages sustained. An action of assumpsit will no more lie for the recovery of these notes, than it would if a party receive a bailment of a horse to be delivered to the bailor on demand, and he refuses to deliver.

2. That these notes were not valuable in law, or in legal contemplation, and therefore were not a sufficient consideration for a contract.

The Mississippi treasury notes were issued under the ordinance of the convention of 1861. This ordinance was passed before the civil war began or was recognized, and to enable the State to make war against the United States, and for the purpose of dissolving the Union by force of arms. Being issued for an illegal purpose, they are void, and impose no obligation upon the State. *Kennett* v. *Chambers*, 14 How. 38; 20 Curtis 24.

Aside from the illegal purpose for which they were issued, they violate the tenth section of first article of Constitution of United States. They were bills of credit.

These notes cannot be held to be valid unless this court decides that the ordinance of secession was valid. The States asserted the right of secession, the United States denied it. The question was submitted to the arbitrament of arms. It was decided against the States, and this court has been organized and holds its power in accordance with the position taken and maintained by the United States. The present government of the State cannot dispute the point judicially.

The Confederate notes were the issues of a belligerant power at war with the government of the United States. It was never recognized as a government by the United States or any other power. It had no *de jure* existence. It could not, therefore, incur any *de jure* liability. Its obligations had no foundation in law, and therefore were binding on no State or nation; they did not possess any legal force or obligation, and a receipt of them cannot, therefore, be the foundation or consideration for an implied assumpsit.

The law can only imply a promise to pay, when it is shown that the original deposit was of a thing valuable in law. If it was of no legal value, no implied assumpsit can arise.

Suppose the deposit had been of counterfeit money, and on demand the Greens had refused to deliver, the law would not have implied any promise to pay their nominal value.

This is a very different case from that where a party, during the war, by express contract, received payment for an article in Confederate money. He may be held to his bargain, for, during the war, the laws of the United States being suspended, it was not illegal to receive Confederate money in payment of a debt or for property. But it is very different when you seek, as in this case, to imply a contract to pay money from a conversion or withholding of an article not possessed of any legal value.

3. The fifth instruction given for plaintiff below is clearly erroneous. The agreement between Sizer and Allen in reference to the treasury notes cannot affect the Greens. The Greens, in this form of action, can only be held liable on an implied assumpsit for the actual value of the notes. If Sizer, by reason of the .detention of the funds, had been injured to a greater extent than their value, he can only recover against Green, in a special action on the case, for these damages, and cannot recover on an implied assumpsit for money had and received.

4. That this is a joint suit against the Greens, and Sizer had no right to recover for account against the individual members of the firm. The jury allowed these individual accounts, and for this reason the judgment should be reversed.

*Fulton Anderson*, for defendant in error,

1. Reviewed the testimony at length, and contended that the verdict upon the whole was manifestly just and right, and is only liable to the objection that it did not do full justice to Sizer. That if correct in this view, any supposed error in the instructions could not affect the judgment of the court below.

2. The instructions were properly given, and mainly relate to the legality of the issue of Confederate money and Mississippi treasury notes.

The legality of the issue of Confederate money sustained by the prize cases in 2 Black's R., and in the case of the island of Castine.

There is one difference in reference to the State of Mississippi and the Confederate States. Those who maintain that the Confederate government was not a government *de facto*, do so on the ground that over the largest portion of her territory the government *de jure* still maintained its power, and the Confederate government had not attempted to set aside, but only to separate itself from the other.

This was not true in reference to the State of Mississippi. Within her limits, and over all her territory, the government that existed in 1861 and 1862 was absolutely supreme, and had abolished the government of the United States. At the time the convention passed the ordinance for the issuance of these notes, the United States had not taken up arms to establish itself, and the convention was in peaceable possession of the absolute power of the State, with nothing to disturb or control. This was unquestionably a *de facto* government.

3. The case of defendant in error does not depend upon the decision of the question of the legality of Confederate money, etc. These notes were issued by governments which were established and had power to enforce obedience, and they issued money which became the circulating medium of the country, and formed the basis of every transaction, public and private. This currency was a necessity, and it was a good and valid consideration to support contracts.

4. But if conceded that the issuance of these notes was a

violation of law and public policy, in what did this violation consist? In the issuance of the notes alone, and not in the action of the citizen who dealt in them as things of value. The issuance of the notes may be void, but how can this affect the contract of Green and Sizer, which is founded on a new and different consideration, not infected with any violation of law or public policy? These notes had a value in the market, and that value alone was the consideration of the contract of the parties.

Contracts which are not *mala in re*, however closely connected with violations of law, are valid, if founded on a new consideration, itself not in violation of law. *Armstrong* v. *Toler*, 11 Wheaton, 258; *Farlem* v. *Ramises*, 4 Burrow, 2069; *Tresevant* v. *Elliot*, 1 B. & P. 3; *Farmer* v. *Russell*, 1 B. & P. 295; *Johnson* v. *Walls*, 3 Vesey, Jr. 612; Ex parte *Balnes*, 13 Vesey, Jr. 313.

But it may be urged that these notes were valueless, and therefore not a sufficient consideration. They were not so in point of fact; they were valuable in the market, and passed as currency. On this point it is only necessary to cite *Orchard* v. *Hughes*, 1 Wallace (S. C.).

*W. P. Harris,* for defendant in error, argued,

1. That the questions of facts involved in the case were concluded by the verdict of the jury, and that the verdict was sustained by the testimony and attendant circumstances.

2. The plaintiff in error insists that the contract of the bankers, with the depositors, to pay out the deposits in kind on demand, rests upon no valid consideration in point of value, or legal validity; that the treasury notes, etc., were issued in aid of the rebellion, and, therefore, void—and because void, worthless; or that it was illegal to employ them in the ordinary transactions of business and commerce, so that any contract of which they constitute a basis is void, because in violation of law, or the public policy.

In thus stating the question, it will be perceived that we adopt the analysis which presents to view distinctly the elements

of which the objection to the contract is compounded. If, in point of fact, the deposits were worthless both to the banker and the depositor, no liability, at least for more than nominal damages, could arise for a breach of the contract by the bankers; and it is to be observed, as to this matter, that it is immaterial whether the notes were valueless because issued illegally, or for want of faith in their ultimate redemption. If, however, in point of fact, they were actually and practically valuable, and the contract be otherwise valid, it rested upon a sufficient consideration; and a breach of it created a liability which is measured by the actual market value of the deposits. On the question of the sufficiency of the consideration in point of value, *the matter of fact is decisive.* It would be idle to argue that, although valuable in point of fact, these notes were by construction and intendment of law valueless; for this would be little less than to contend that, though they were valuable, they ought not to have been so treated by the world.

The circumstances of the origin of these notes are of no consequence in considering the sufficiency of the consideration in point of value. After they were issued and became a circulating medium, and were held as private property, it would be as idle to inquire into their origin, between innocent parties, as it would be to inquire into the origin of the cloth exchanged by the Confederate government for provisions, after it had passed into private hands, and was employed by private parties in lawful trade. 1 Wallace's S. C. R., *Orchard* v. *Hughes.* The proof is clear that the deposits were a circulating medium, constituting the currency of the country, and the standard of the value of commodities employed in trade, etc., and having a value in market.

Was the contract *illegal?* It is to be observed that there are certain acts, which, though innocent of themselves, are held to be illegal on account of the design or purpose with which they are done, and certain acts which are illegal, without regard to the purpose or intention of the party committing them. The act of leasing a house is, in itself, lawful; but if done for the purpose of facilitating prostitution, or any unlawful business, it would be illegal. This is an example of the first mentioned

Green *v.* Sizer.

acts.   In the second class we place acts prohibited by express law—as selling merchandise on the Sabbath, retailing vinous and spirituous liquors without license, etc.   The acts falling within the provisions of these prohibitory laws are illegal, because prohibited in express terms, and the motive or object of the parties is of no consequence whatever, and no proof on that point is ever deemed necessary; but in regard to those acts not prohibited by express law, and which are only illegal because done with an illegal design, or to promote an illegal purpose, the design must be positively averred and proved.   There was and is no law forbidding the employment of the notes in question after their issuance, and after they have become private property, in the ordinary transactions of life.   The act of purchasing clothing, food, or other necessaries—of paying debts or taxes with Confederate money or other currency of a like character, not being prohibited by express law, is unquestionably innocent, unless coupled with a design in the contracting parties to violate law or aid in its violation.   The contract of the bankers in the ordinary course of business to receive on deposit the treasury notes in question, and to pay them out on the warrant or check of the depositor, not being prohibited by law, was clearly legal, unless made with a design to promote resistance to the authority of the United States, or some other unlawful purpose; and this is not pretended.   It is manifest that no motive influenced the particular dealing, save the ordinary incentives in the business which the bankers followed.   The banker had the use of the deposits until called for, and the depositor had the safe-keeping of his property.   These were the motives, and none other existed.   The issue of the notes had been consummated; they existed as a currency, and had a well-known market value.   There was no law prohibiting their use in private dealings. The government of the United States took a peculiar delight in treating these issues with contempt; they passed no law pro-hibiting their use.   The argument that the effect of recogniz-ing these issues as possessing value, was to inspire confidence in the credit of the government, which credit was materially instru-mental in maintaining the war, cannot prevail.   Where there is no

prohibitory law, and no illegal design, the fact that the indirect and remote consequences of the act, although not so designed, might probably prove injurious to the interests of the United States, could not affect the validity of the contract on this point, as well as on the general doctrine. I refer to *Kreiss* v. *Seligman*, 8 Barb. N. Y., page 439, for a very intelligent and satisfactory examination of this subject. Nothing is more manifest than that the sale of liquor tends to promote disorder and breaches of the peace, yet it is equally manifest that, without a prohibitory law, the sale would be legal. It would be most unreasonable to hold that all acts, which by their possible or remote tendencies may affect the public injuriously, are illegal, although injury to the public was not designed. Assuming that the issuance of the treasury notes was illegal, still the general principle applicable to subsequent contracts, growing out of prior illegal transactions or contracts, is not applicable to this contract. It will be observed that the cases which give rise to the principle are distinguished by *this feature*, that the subsequent contract is designed to *fulfil* the *first*, and its direct effect is to carry out the original purpose, either by paying the *price* or by doing the *thing* stipulated for, or to further the object contemplated by the first, as in the case of *Kountz* v. *Dickson and Price*, Op. B., and cases reviewed there.

In this contract there is no design to redeem the notes, no design to further their redemption; it is simply a contract to return them when called for.

Besides, the mere employment of those things, in the ordinary transactions of business—which by universal consent have become a currency, a circulating medium, a standard of value, and which have acquired, by force of the inevitable laws of commerce and finance, the character of chattels, which pass from hand to hand, supplanting all other currency, and taking the place and performing the functions of money in the business of the world—is not to be governed in law by a different rule from that which governs money and chattels. The character which they held in the commercial world was derived from agencies over which neither this nor any other government had

any control. · They had a value in trade and commerce; they were salable at London, Paris and New York; they were property. The idea, therefore, that every transaction into which they entered as a consideration was illegal, is astounding. On the question as to the character of the State and Confederate governments which prevailed at the date of these transactions, I forbear to speak, as the question was, in all its aspects, discussed very fully before this court at a former term. I will observe, however, that it is difficult to perceive how the public policy of the United States could prevail in a country where its laws were not enforced, and where a different government, different laws, and a different policy prevailed over a people, for the most part, willing to obey, and where the unwilling were compelled to obey; and in a country from which the laws of· the United States were successfully repelled, and replaced by another regularly organized government, and by regularly constituted laws. The convention of ˙the State and the legislature here clearly declared that transactions in the " currency " are not to be held void where no unlawful design mingled in them. The parties here both understood upon what bases the currency rested; no deception was practised. It was used universally by the " loyal " and the " disloyal."

There is no example to be found of such private dealings being declared illegal. The British government, on one occasion, by positive law, prohibited dealing in the securities of a government with which the former was at war; but that course was not deemed necessary by the United States.

HANDY, C. J., delivered the opinion of the court.

This was an action of *indebitatus assumpsit*, brought by the defendant in error against the plaintiffs in error, for the sum of $4,013. The declaration contains five counts. The first charges the defendants below, as bankers, for that sum of money deposited by the plaintiff with them, and which they promised to pay; the second is for money lent and advanced; the third is for goods, wares, and merchandise sold and delivered; the fourth is for money had and received; and the fifth is upon an account stated.

The bill of particulars filed with the declaration,
    charged the defendants with " a cash balance as
    per bank book,"............................$4,175 00
And with an aggregate amount of accounts due by de-
    fendants from 1st January, 1858, to May, 1862,
    each of which had been rendered,............. 1,263 00
And with errors in inventory of drugs and books
    bought May, 1862,.......................... 450 00
                                                 $5,888 00
And gave defendants credit for principal and
    interest to May 1, 1862, of balance of note
    of plaintiff,............................$1,850
And commissions on bill of medicines,........ 25 1,875 00
            Balance due plaintiff,................$4,013 00

The defendants pleaded *non assumpsit* and *payment,* and with
the latter plea, filed by way of set-off, a note made by plaintiff
and H. E. Sizer to the defendants, for $3,799.60, due 1st Jan-
uary, 1855, having sundry credits indorsed; and an account of
goods received by plaintiff to be sold on commission for defend-
ants, amounting to $1,000, and to the plea of payment the plain-
tiff filed the general replication.

The verdict was for the defendants for $218.37, and they
moved to set it aside, and for a new trial on several grounds,
which motion was overruled; and hence the defendants bring
the case here.

The facts of the case present several questions of great interest
and delicacy, and involving principles of very grave importance
to the people in the existing state of the country. Sensible as
we are of the great. magnitude of these questions, we have
maturely considered them, and now proceed to give the result
of our deliberations upon them.

The evidence touching the several points presented is volumi-
nous, but the substance of it will be stated as we come to
examine each of them.

The first question for consideration is, whether the action, in

the form in which it was instituted, can be maintained on the facts of the case.

It appears, by the record, that the action was founded mainly on certain funds known as Confederate treasury notes, Mississippi cotton notes, and Mississippi (military) treasury notes, which the plaintiff had from time to time deposited with the defendants, as bankers, during the years 1861 and 1862. From April, 1862, to October in that year, these Confederate and cotton funds are shown to have been worth in the market from two to two and a half for one in gold and silver, and Mississippi treasury notes, due in 1863 and 1864, were worth from five to twenty-five per cent. more than Confederate money, and in December, 1862, they were worth about ninety per cent. premium over Confederate money. But, during the time stated in plaintiff's account, these several funds constituted the only circulating medium of this State, and the defendants, as bankers, kept the accounts of customers by crediting the deposits as so much of whatever kind of funds were deposited, and paid out the same kind of funds. A general check was paid by them in Confederate notes, and, if other funds were drawn for, it was designated. It further appears that, in May, 1862, the defendants had on deposit, to the credit of the plaintiff, in cotton money, $828.97 ; in Confederate money, $1,496.25 ; and had received of him $1,600 in Mississippi treasury notes, which last sum was handed to them by the plaintiff, in consequence of an understanding between the parties that the defendant would accept that kind of funds in payment of the note of the plaintiff, held by them and here set up as a set-off. After receiving this last sum, it appears that the defendants refused to credit it on the note, and also refused to deliver it back to the plaintiff. Their reason for this course will be hereafter considered.

As to the other funds, Confederate and cotton money, on deposit, the testimony is in direct conflict, as to whether the defendants, about May, 1862, or afterwards, refused to pay the same to the plaintiff upon his demand ; the plaintiff stating the affirmative, and the defendants the negative. It would appear that the jury found that they did refuse to pay or credit the

same on the note; and, with respect to the point now under consideration, it is proper to take that view of the matter. There is also evidence tending to show that the defendants kept on hand these Mississippi treasury notes received of the plaintiff, and made no use of them for their own benefit; and it appears that, by reason of the defendants' refusal to deliver those notes to the plaintiff, he lost the full value of the notes as at par.

On this state of facts, the court, at the plaintiff's instance, instructed the jury as follows:

" That if they believe, from the evidence, that the plaintiff applied to the defendants to apply his deposits to the payment of the note they held against him, and they refused to do so, and, on such refusal, that the plaintiff demanded that his deposits be delivered to him, and the defendants refused to deliver them, they are liable for their value at the time of such refusal."

And the court refused to give the following instruction asked for the defendants:

" 5. Even if the jury believe that Sizer demanded the return of his deposit of Mississippi military treasury notes, and that defendants refused to redeliver the notes, yet, if they also believe from the evidence that defendants have not, in any way, used said notes, or received any value therefor, then, in this action, Sizer cannot recover on this item. His remedy, if any, is not in such an action as this; and on this action the jury must reject that item from their verdict."

These instructions present the question, whether the funds received by the defendants, under the circumstances of the case, can be regarded in law *as money*, to any amount, so as to support the count in the declaration for money deposited, or the other counts for money.

It is insisted, in behalf of the plaintiffs in error, that all or any of these funds are not money in law, but mere specific chattels; and that not having been converted into value in money by them, and not having been appropriated to their use, they are not responsible in this form of action, as for money.

Money is defined to be *cash, that is, gold or silver, or the*

*lawful circulating medium of the country, including bank notes when they are known and approved of, and used in the market as cash."* Burrill's Law Dict. Its import is derived from the laws of commerce; and, in commercial acceptation, it means that which passes in a country as the medium of exchange, and the representative of value; and whether, for the time being, it be the precious metals, or any chattel of intrinsic value, as tobacco or cotton, or that which is issued under the authority of government, and by common consent is agreed on to represent value, and to pass from hand to hand as such, and in its character to be convertible into value, such as government or bank bills and certificates of value, payable to bearer, it is money. McCulloch's Com. Dict., titles Money and Banks.

This principle, as applicable to bank notes, is settled in the leading case of *Miller* v. *Race*, 1 Burr. 452, in which Lord Mansfield says : " They are not goods, not securities, nor documents for debts, nor are so esteemed; but are treated as money, as cash, in the ordinary course and transaction of business, by the general consent of mankind, which gives them the credit and currency of money to all intents and purposes. They are as much money as guineas themselves are, or any other current coin that is used in common payments as money or cash." That rule was afterwards affirmed and established in the cases of *Grant* v. *Vaughan*, 3 Burr. 1516, and *Gorgier* v. *Mieville*, 3 B. & C. 45; in the last of which it was applied to government bills, and it has ever since been followed in England and in this country.

Not to cite the almost numberless cases in this country, in which it has been sanctioned, we will refer only to the language of Chancellor Kent in *Mann* v. *Mann's Exrs.* 1 John. Ch. R. 236, who says, that the term " *moneys* extends to bank notes, when they are known and approved of, and used in the market as cash."

But it may be said, that the rule cannot apply to depreciated government or bank bills—which are not equivalent to gold or silver in the market, though they may pass as the circulating medium—because they are not the true representatives in

value of gold and silver at the time, and are not redeemable at par. This objection, though plausible, is not sound.

The main reason why such notes are considered money, is that, by common consent, they pass from hand to hand as the representatives of value. They are promises to pay value, which, for public convenience, are received by the community on the faith that the promisor will be able to pay the sum promised, and that it will ultimately be paid. They are not the less the circulating medium and substitute for value, because they are depreciated when compared with gold or silver; for they may pass and answer all the purposes of a medium of exchange, notwithstanding they are known to be of less value, at the time, than gold and silver coin. In such circumstances, their real value is still governed in this country by the standard of gold and silver, because the Constitution of the United States, which recognizes nothing as legal tender for the payment of debts but gold and silver, always subjects their real value to that test. Still, they constitute the circulating medium of the country. For the most part, however, though they pass at their nominal value, yet property purchased with them or exchanged for them, in the course of trade, is obtained at a price enhanced to the extent of the depreciation; so that the price at which the article is purchased, and at which the money passes, is really the same in value as if gold or silver were the medium of exchange. Thus, if a horse could be purchased for $100 in gold or silver, but that ceases to be the general circulating medium and bank paper takes its place, which is depreciated fifty per cent. below gold or silver, the same horse cannot be bought for less than $200 in the circulating medium. The horse is really worth no more at one price than at the other, $100, which is the real value of the bank paper for which he is purchased. But yet the bank paper is as much a circulating medium and representative of value, as the gold or silver. The only difference is, that the article is sold for a higher nominal price in one currency than in the other. But they are both the currency at the respective times, and therefore money, whose real value is to be ascertained by the test of the legal standard.

The same principle would apply if cotton, tobacco, or any other commodity of intrinsic value were treated as the circulating medium; for such articles would be governed in value according to the law of demand and supply. If they were scarce at any particular time, and other articles to be purchased with them were abundant, the market value of that circulating medium would be high; and if the relative values were reversed by the same cause, the respective values would change accordingly. This is every day's experience; and indeed the same principle also affects the market value of gold and silver, as was shown a few years ago by the great increase of gold from California and other parts.

What shall be money is conventional, and is chiefly governed by natural and artificial causes proceeding from the state of trade and of commerce. By reason of natural causes, or of the exigencies of a country, or of over-action in trade, the circulating medium may, from necessity, be mostly in paper currency, to the almost, if not entire exclusion of gold or silver, and of course depreciated below that standard. This has been frequently exemplified at several periods in the history of the United States, when the entire domestic business of the country has been transacted in bank paper issued by the authority of the States or of the Federal Government; when gold and silver as a general circulating medium had become utterly impracticable, and when nearly every substantial interest in the country would have been destroyed if bank paper had not been adopted as the circulating medium. To say that in such circumstances the rights of parties growing out of, and founded on the prevailing currency of the country, were not to be considered as having been conducted for money, would be to take a very narrow view of the true principles affecting currency, to sanction gross injustice, and to ruin all the important interests that had accrued from the necessities of the business of the country.

If it be true that depreciated paper currency is not to be considered as money, then the amount of depreciation does not affect its character, and the smallest rate of discount would

deprive it of the character of money.    Let us observe the practical effect of this.

In the best state of currency in the United States, some six years ago, the notes of specie paying banks in the Southern and Western States were depreciated in New York to the extent of the cost of exchange between that city and the place where the particular bank was located—say Nashville or New Orleans. Suppose a merchant in New York had received for his customer in Nashville, a sum of money in the notes of one of the Nashville banks, then at par there, but at a discount of from one to five per cent. in New York, and had failed to pay it without justification until the close of the war, when the bank proved to be insolvent—could it be said, for a moment, that the merchant in New York had not received *money*, and that the customer could not recover the value of the notes in New York at the time, *as money* had and received ?    Certainly not; and the same principle appears to apply when the depreciation is great, provided the funds received were current as the ordinary circulating medium at the time they were received or when default was made.    If this be not true, no paper currency can have the character in law of money, unless it be convertible into gold or silver at the time, and especially if it be at a considerable discount, however universally it may be the medium of all the pecuniary business of the country, and however constraining the necessity which caused its adoption as such.

The present condition of the currency furnishes a forcible illustration of the subject.    The United States treasury notes and national bank currency are at a discount of near fifty per cent. below gold or silver, and have been more than two hundred per cent. below par during the war, and they are not redeemed at par in gold or silver.    Yet they pass generally as the circulating medium ; and can there be a doubt that a person receiving such funds for another would be liable for the value of the notes in gold or silver, as for money had and received ?

But this can scarcely be considered an open question in this court.    For several years after the financial explosion of 1837, the currency of this State consisted almost entirely of our own bank

notes, which were not redeemed and were greatly depreciated. During that period the largest portion of our business transactions was conducted by means of this depreciated bank paper; and, in many instances, notes were executed for money to be paid in the notes of those banks. In some of these instances suits were brought *as on promissory notes*, and the actions were maintained in this court, which could not have been the case if the notes sued on had not been considered as for the payment *of money*.

*Bonnell* v. *Covington* was an action of *assumpsit* on a note payable "in the notes of either of the banks of Natchez or of the Union Bank," which it appears were depreciated; and it was held that the plaintiff was entitled to recover the value of the bank notes at the maturity of the note (7 How. 322). Of the same character is *Abbott* v. *Agricultural Bank*, 11 S. & M. 405. In these cases the objection does not appear to have been directly raised that the depreciated notes were not money, and that, therefore, the paper sued on was not a promissory note. But that point was distinctly made and urged in the cases of *Gordon* v. *Parker*, 2 S. & M. 485, and *Scott* v. *Hamblen*, 3 Ib. 285; both of which were actions of *assumpsit* on notes payable, the one in "Brandon money" and the other in "Citizens' Bank funds," which, it appears, were depreciated at the time. The notes were sued on as promissory notes for money, and the actions were sustained, notwithstanding the objections here urged; and it was held that the plaintiffs were entitled to recover the value of the depreciated bank notes in gold or silver. These cases appear to be decisive of the question in this court.

We think, therefore, there was no error in giving the instruction for the plaintiff, or in refusing that asked for the defendants.

The next ground of error insisted on, arises on the fifth instruction given at the instance of the plaintiff below, as follows:

"If the jury believe that Sizer obtained the $1,600 of treasury notes from Allen to pay Green with, on an understanding with Allen that, if Green would not take them, they should be

returned to Allen, and that Sizer was prevented from return-
ing them to Allen by Green's retention of them, and that thus
Sizer lost $1,600 of the indebtedness of Allen to him, then the
Greens are liable for the whole of the $1,600, in gold or silver."

The evidence in the record in relation to this question is, in
substance, that Sizer was desirous to pay the note he owed the
defendants, and conferred with J. Green on the subject, who
agreed to receive payment in those funds, if he would pay the
whole note.   There is a discrepancy in the statements of the
parties as to the date of this transaction; Sizer testifying that it
was, as he thinks, in November, 1862, and Green testifying posi-
tively that it took place in April, 1862.   The latter statement
appears, by other circumstances, to be correct.   It appears that
one Allen was indebted to Sizer, in a note for gold or silver,
and that, shortly after this interview with Green, Sizer called
on Allen and got from him $1,600, in Mississippi treasury notes,
which he agreed to credit on the note of Allen, provided he
could use them towards the payment of his note to Green; and,
if he could not so use them, Sizer was to return the notes to
Allen.   Sizer then took these notes to the banking house of
the defendants, and delivered them to J. Green as a special
deposit, and they were so entered by Green on the banking
books.   A few days thereafter Sizer came to the office of the
defendants, and said he could not raise the balance of his note
in Mississippi treasury notes, but proposed to pay the same with
other funds—cotton and Confederate money—then to his credit
with defendants; which proposition Green refused.   Sizer
states that he demanded that the $1,600 should be credited on
his note, which Green refused; and that he thereupon demanded
all his deposits, which Green refused, saying that he intended
to hold them as a security for the note of Sizer.   Green denies
that he demanded payment of the other deposits, but admits
that he demanded the Mississippi treasury notes obtained from
Allen, and that he refused to deliver them, and retained them
as a security for Sizer's note.   But they were not credited
on that note, and were never paid back to Sizer.

It is again contended that *in this form of action*, the plain-

tiff could not recover either the amount of these funds, or for the loss sustained by him by reason of the detention of the funds by the defendants, or of their failure to give credit for the amount on the plaintiff's note ; and, hence, that the instruction was wrong.

As to the plaintiff's right to recover, in the form of action, it is above shown that he was entitled to recover, at all events, the market value of the funds. But a party may be entitled to recover more under certain circumstances ; and this appears to present a case of that sort.

It appears, by the evidence, that the defendants had agreed to receive the kind of funds afterwards delivered to them by the plaintiff in the payment of his note, and at par ; and in consequence of that agreement, that the plaintiff delivered them the $1,600 ; that after receiving the funds they refused either to deliver them back or to give him credit on his note for the amount, but kept the funds in their hands until they became of no value. Now it is clear that the plaintiff had the right, under the circumstances, to treat the funds as received under the agreement, or converted to the use of the defendants. Whether they were so actually used to the defendants' benefit or not is immaterial as to the rights of the plaintiff. They had agreed to receive them at par ; he had paid under that agreement. If the agreement was not complied with by him in paying a part of the debt due in the funds agreed on, it was his right to have his funds returned to him when the defendants objected that the whole sum was not paid, as agreed on ; and by refusing to return him the funds paid, they became responsible as for so much money had and received for the plaintiff's use, and they took the hazard of the loss occasioned by the subsequent depreciation of the funds. Otherwise they would be permitted to take the benefit of their own wrong, and to cast on the plaintiff a loss which had resulted entirely by their own wrongful act. Under such circumstances he is entitled to treat the funds as converted to the use of the defendants. The case of *Pickard* v. *Banks*, 13 East. 20, is an authority to show that in such a case the action for money had and received will lie.

But, under the pleadings in this case, there can be no question of this right, whether the plaintiff was entitled to recover the amount as money had and received or not, in an action solely of that complexion.

The bill of particulars filed with the declaration shows a case of mutual credits between the parties, and the action was brought to recover the balance due the plaintiff. The defendants pleaded payment, and set off the note of the plaintiff in bar of his claim, and the plaintiff replied, denying the payment. This plea of set-off is, in law, a cross-action, asserting the defendants' right to recover the amount of the plaintiff's note set up in the plea. Upon a general traverse of that demand—which was the legal effect of the plaintiff's replication—the question is, what sum were the defendants entitled to recover in their cross-action. In determining that question, it is clear that the plaintiff was entitled to credit for all that he had paid on that claim; and, if it appeared that the plaintiff had paid certain funds which the defendants had received in consequence of an agreement between them, and which were retained and refused to be returned to the plaintiff on his demand until they became worthless, especially if the plaintiff had to pay the full value at par of the funds in obtaining them, there cannot be a question that the plaintiff would be entitled to credit for the sum received by the defendants. For, after the funds were paid, they were either the funds of the defendants or of the plaintiff. If of the former, they should have been credited as agreed; if of the latter, the refusal to return them on demand renders the defendants liable for all the actual loss which the plaintiff has sustained as the result of the wrongful detention.

Upon either of the above views the instruction was right.

We come now to consider the objections urged to the action of the court in granting the *fourth* instruction in behalf of the plaintiff, and in refusing the *first*, *second*, and *fourth* instructions asked in behalf of the defendants.

These instructions present for our determination the very important questions, whether contracts of an executory nature, founded on the consideration of what is commonly called Con-

federate money or State currency, issued during the recent war, or obligations incurred on account of such currency, are valid in law, and can, under any circumstances, be the foundation of any legal right. The negative of this proposition is contended for by the counsel for the plaintiffs in error, who insist that such currency, being issued in aid of the rebellion, was illegal and void, to all intents and purposes, as against public policy, and that it cannot form a valid consideration for any contract or obligation, under any circumstances, or in favor of any person; and hence, that there was no right of action in the plaintiff in this case.

The argument in support of this view has been directed entirely to the power of the Confederate and State governments *to issue* the notes in question, in opposition to, and independently of, the rights and powers of the United States under the Constitution.

We do not consider it necessary in the present case to decide whether *the issue* of those notes by the Confederate and State governments rendered them valid in law, in point of the right and power of those governments, in the condition in which they were then placed, to issue them. That is a question of very grave moment, which we do not think necessarily involved in this case. The true question here is, whether, after they were issued and had passed into circulation, they could become the foundation of any legal right in the hands of a person who had received them in good faith and in the course of his lawful business, as currency, and upon which he could make a valid contract.

It appears by the record, that the notes in question constituted the only currency of the State at that time, and passed from hand to hand, as money, in the pecuniary transactions of the people; and that those received by the plaintiff, were received by him in due course of business as money, without any participation on his part in their illegal issue, and upon no consideration of aid, on his part, to the rebellion; that they were afterwards deposited with the defendants upon a contract, express or implied, that they were to be paid back by them to

him, or applied to his credit; and this contract had no reference to the rebellion.

It is not pretended that these funds were, in fact, of no actual available value when they were received by the defendants, and were refused to be paid over to the plaintiff; and, on the contrary, it is shown that they were available to him, to a considerable actual value in gold or silver. But it is contended that, because they were illegally issued originally, they could never be the foundation of a valid contract in a transaction between private citizens.

Conceding, for the purpose of the present case, that the issue of these notes was an unauthorized and illegal act, yet it is so in but two points of view:

1. In setting up a power in opposition to the authority of the United States.

2. In giving aid and support to the military operations against the government of the United States.

As to the former, it is manifest that the conduct of the plaintiff does not bring him within its condemnation. The position of the Confederate States, severally or unitedly, in opposition to the United States, was taken before the notes in question were issued. Whatever right or power they had to set up a government independent of that of the United States, had been already put into requisition. The step had been taken, and a government was formed, which claimed to be independent, and which proceeded, in point of fact, to exercise all the powers of a separate and independent government. And the issue of these notes was in the exercise of one of those powers. Of course, the plaintiff in receiving the notes, after they passed into circulation as money, and in treating them as such, could have been in no wise inculpated in any public wrong that may have been committed in the effort to set up an independent government, since that had already been set on foot before they were issued.

As to the second, there is nothing to show that the reception of the notes by the plaintiff and his treating them as money, had any connection with the rebellion. The notes were in circulation, and the medium of exchange in the private transactions of

our citizens. They were used as money in the civil and domestic pursuits of our people, and were so received by the plaintiff. Even a state of war does not contemplate the barbarian rule of suppression of all the domestic business of society; and the necessities of the times established these notes as the medium by which these transactions were carried on. The government of the United States appears to have acquiesced in this necessity; for though the most rigorous military expedients were adopted by public authority, in relation to matters bearing upon the war, no act was passed by Congress prohibiting the issuing or circulation of currency of this description, when its existence was a matter of notoriety.

But it is said that in receiving and passing these notes, aid was given to the rebellion, because they were *necessary to the maintenance of it*, and that that object was promoted by receiving them in the private transactions of individuals.

This is an assumption which is not established. The bonds of governments, which do not circulate as currency, are frequently more valuable in the market than the ordinary currency of the government, or the other circulating medium of the country. This was the case with Confederate bonds during a considerable period of the war, and is now the case with the United States bonds. Governments usually conduct all their financial operations by means of loans, public securities, and other currency than their own issue. It does not, therefore, appear that the maintenance of the rebellion absolutely depended on the issue of this currency. But the policy of issuing the notes under consideration was intended in a great degree, on the part of the Confederate government, to supply a circulating medium for the country, in order that its domestic business might be carried on.

But whether this was the purpose for which the currency was issued or not, it, in fact, became the representative of the private property, debts, and contracts of our citizens, *after it was issued*, simply because, from necessity, these notes were the substitutes for value, and not because the citizen in receiving them was in any way actually implicated in giving aid to the

rebellion ; and his receiving and passing them would not neces-sarily be illegal.

The error on which the objection under consideration proceeds, consists in not correctly estimating the office and character of a circulating medium. We have repeatedly said above that it is the representative of value. It represents *property* and stands in the place of it in the dealings of men; and that is its prin-cipal office. For it, the planter sells his cotton, the trader his stock, and the merchant his goods. It is the form in which value and property are estimated in such dealings. It is, therefore, entitled to the same benefit of legal protection in the contracts of individuals as the property it represents would be entitled to if the property had been exchanged in specie ; and if the use of the property in such a transaction would not be unlawful, so the employment of the medium in the place of it would not be. Thus, if a man purchase a horse, and instead of giving a bale of cotton or a hundred bushels of corn for it, he gives so much of the circulating medium, in use at the time, as is considered of equal value with the bale of cotton or hundred bushels of corn, the purchase is valid unless it be prohibited by law. For the contract is as valid when one medium of exchange is used as the other, provided neither be in violation of any positive law or declared public policy; because in either form, *it is property,* and as such is entitled to protection on principles of natural justice. When there is no positive law forbidding the use of the particular circulating medium, and when it does not appear that the party in the act of receiving or using it, was engaged in any purpose clearly and positively in contravention of public policy, the act cannot be condemned as illegal.

We may test the legality of receiving and passing such funds, by considering whether the party would be guilty of any offense in law, by such acts. He would clearly violate no positive law, where there is no criminal participation ; for he has only exercised his right over his private property as a citizen might lawfully do, without in any way involving himself in the exist-ing war. If the act were done with the intent to aid the rebellion, it *might* be criminal on account of the intent, and he

*might* be liable criminally by reason of it. But if not a criminal act, it is in violation of no law ; and there being no unlawful purpose, it is clear that it is not a criminal act, and hence it is not unlawful.

These notes, then, stand on the footing of private property ; and as well might it be said that specific private property, in this State, was not a sufficient consideration for a contract during the war, as to say that these notes, which were received without any illegal taint, could not form a valid consideration for a contract. For the private property of the citizen of the Confederate States was essentially the material resource on which the rebellion and the success of the whole cause depended. It was the source from which revenue, the sinews of war, was raised. It was impressed to supply military resources ; it was used in every way that the exigencies of the cause required, for its purposes of civil and military finance ; and it was the basis on which the resources of the war absolutely rested. It was under the actual power of a subsisting government ; and whether rightful or wrongful, is immaterial, since the citizen was compelled to submit to its authority. It was, *in fact*, the potential government, which, for the time being, controlled his rights, his property, and his action. The same necessity and control gave rise to the existing circulating medium. The citizen was powerless to resist its operation. No one will contend that a contract, during that period, founded on the sale of a piece of personal property, would be illegal, because it was founded on that which constituted a part of the material resource by which the rebellion was sustained ; and, upon the same reason, a contract founded on that which under the same exigency was the representative of the property, cannot be illegal.

If it be true that these notes were necessarily illegal and void in the hands of a *bonâ fide* holder for value, because they emanated from governments in rebellion, and having no rightful authority to issue them ; upon the same principle, all kinds of personal property ever in the possession of the hostile government would be contraband in the hands of a subsequent

holder. The merchant who, during the war and in the course of his lawful business, obtained a quantity of cloth, or a number of wagons, manufactured by the Confederate States; or the planter who fairly became the owner of horses or mules formerly the property of that government—would be incapable of making a valid contract founded on such property, however honestly it may have come to the hands of the party, and through whatever number of hands it may have passed before it came to his possession. But such a doctrine will scarcely be contended for.

This war, on the part of the United States, was directed against the *political status* of the seceded States, and not against the private rights and property of the individual citizen. The right of such property was not disturbed by the war, unless it was actually seized and appropriated to the use of the United States, and the right of the owner positively divested. As a general policy, it was not further interfered with; and as matter of legislation, no policy, beyond that just referred to, was declared by the United States in regard to it. The private debts and credits subsisting between private individuals in their domestic pursuits, were likewise not the subject of the action of the government, unless they were actually seized and appropriated.

Since the termination of the war, there is no reason of public policy which demands that rights of private property, acquired during its existence, should be disturbed; and there are strong reasons of justice and sound policy why they should be treated as fixed rights, and should have the protection of law. As between individuals, this is consonant to justice; as to the government, it does not endanger the public safety; and as to society, it tends to promote peace and quiet among its members, by protecting private rights honestly acquired.

In the case of *Dick* v. *Boylan*, at this term, the following language is used by this court, and is pertinent to the question before us here:

"In a state of war, the citizen being compelled to submit for the time to the party having the possession and control of the

territory in which he resides, becomes subject to its dominion ; his property and person are governed by its laws, and without regard to the international strife ; *his private rights, under the municipal law to which he is thus subjected, must remain the same, no matter what may be the result of the struggle.*  *  *  * *The subsequent resumption of authority by the former sovereign cannot change the character of past transactions, or deprive the citizens of rights vested* under the laws of the territory *while it was possessed and governed* by the enemy as their territory."

By the result of the war, the notes issued by the Confederate government have become valueless, because that government has ceased to exist. But this does not render void private contracts made in good faith, and founded on them during the war, and having no connection with the rebellion. The principle is thus laid down by Rutherforth. Speaking of the consequences of the destruction of a State, he says :

" The debts of a society are cancelled when the society perishes ; and though the members, whilst the society subsisted, were jointly bound to contribute towards the payment of the public debts, this obligation will cease when the society subsists no longer. *But the destruction of the society does not cancel any debts which the members of it had contracted as individuals upon their own private account."* Rutherforth's Inst., book 2, chapter 10, section 13.

It is the policy of governments to maintain the inviolability of contracts between individuals, because it tends to promote morality and public virtue ; and the obligation of such contracts will never be interfered with, unless they manifestly appear to have been entered into in contravention of positive law, or of some high principle of public policy. But such violation will never be presumed.

The rule in relation to the validity of contracts which emanated remotely or consequentially from illegal acts, is stated with great clearness in the case of *Toler* v. *Armstrong,* 4 Wash. C. C. R. 297, by that eminent jurist, Justice Washington, as follows :

" Does the taint in the original transaction infect and vitiate

every contract growing out of it, however remotely connected
with it? This would be to extend the rule beyond the policy
which produced it, and would lead to the most inconvenient con-
sequences; carried out to such an extent it would deserve to be
entitled a rule to encourage and protect fraud. So far as the
rule operates to discourage the perpetration of an immoral or
illegal act, it is founded in the strongest reason, but it cannot
be safely pushed further. If, for example, a man who imports
goods for another, by means of a violation of the laws of his
country, is disqualified from founding any action upon such ille-
gal transaction, for the value or freight of the goods or other
advances made on them, he is justly punished for the immorality
of the act, and a powerful discouragement from the perpetra-
tion of it is provided by the rule. But after the act is accom-
plished, no new contract ought to be affected by it; it ought
not to vitiate the contract of the retail merchant, who buys these
goods from the importer; that of the tailor, who purchases from
the merchant, or of the customers of the former, amongst whom
the goods are distributed in clothing—although the illegality of
the act was known to each of these persons at the time he
contracted.

"I understand the rule, as now clearly settled, to be, that
where the contract grows immediately out of, and is connected
with, an illegal or immoral act, a court of justice will not lend
its aid to enforce it. * * But if the promise be uncon-
nected with the illegal act, and is founded on a new considera-
tion, it is not tainted by the act, although it was known to the
party to whom the promise was made, and although he was the
contriver and conductor of the illegal act. Thus, if A should,
during war, contrive a plan for importing goods from the coun-
try of the enemy, on his own account, by means of smuggling
or of a collusive capture, and in the same vessel should be sent
goods for B, and A should, upon the request of B, become
surety for the payment of the duties, or should undertake to
become responsible for expenses on account of a prosecution for
the illegal importation, or should advance money to B to ena-
ble him to pay those expenses; these acts constituting no part

of the original scheme—here would be a new contract upon a valid and legal consideration, unconnected with the original act, although remotely caused by it; and such contract would not be so contaminated by the turpitude of the offensive act, as to turn A out of court when seeking to enforce it, although the illegal introduction of the goods into the country was the consequence of the scheme projected by A in relation to his own goods."

This·able and lucid exposition of the law shows the true distinction between contracts which are illegal, and such as are legal and valid, when founded on, or connected with, an illegal transaction; and states the rule to be, that, in order to render such a contract illegal, it must grow immediately out of, and be immediately connected with, the original illegal or immoral act, and not be founded on a new consideration; and further, that a subsequent sale of the subject of the illegal act after the original act is consummated, and a contract founded thereon, will be valid. It was affirmed in the Supreme Court of the United States, by Chief-Justice Marshall, in 11 Wheat. 258, after elaborate argument by distinguished counsel; and it has been repeatedly recognized by this court. *Wooten* v. *Miller*, 7 S. & M., and *Kountz* v. *Price and Dixon*, at last term.

This case appears to come fully within these principles. The contract here was founded on a new consideration, not connected with the alleged original illegal act, and between new parties. No ingredient of an illegal nature is shown, except that it was founded on the notes illegally issued, as is assumed, but with which the plaintiff had no connection. He merely received the subject of the illegal act for a valuable consideration, and in the course of his lawful business, without any connection on his part with the act of illegal issue. This appears to be analogous to the case put by the learned judge in the case of *Toler* v. *Armstrong*, of a retail merchant who buys goods from the illegal importer, or of any other person who subsequently acquires a right to them, and founds a contract on them.

It is urged, that the plaintiff was bound to know that the notes were issued in aid of the rebellion and were void, and

that he must be presumed in law to have known their illegality. But that does not vitiate his contract founded on them—there being no law prohibiting their circulation—if his contract was upon a new consideration, and he was not connected with the alleged original illegal act.    And this is distinctly held by both of the learned judges in the case of *Toler* v. *Armstrong.*

The case of *Kennett* v. *Chambers*, 14. How. (U. S.), relied on in behalf of the plaintiffs in error, is not in conflict with the principle above stated, and is not in point ; for that was a suit to enforce an illegal contract by the party who had done the original illegal act.

Again, it is insisted that the notes in this case stand upon the same footing as counterfeit notes, and are to be governed by the same principle.

.But the distinction is very manifest.    Counterfeit notes are founded wholly in fraud, and are entitled to no credit or value. It is the deception alone that causes them to pass, and they are of no value, either intrinsically or in the market, by consent founded on a knowledge of their true character.    But notes issued by existing corporations, and which are what they purport on their face to be, and are recognized in the market as money, have a value in fact, which gives them the character of money, though they may afterwards prove to be unavailable.    This distinction is recognized in many cases, in which it has been held, that a payment in the notes of a bank, supposed by both parties to be of specie value at the time, but which were depreciated in consequence of the failure of the bank to redeem its issues—which fact was unknown to the parties at the time of payment—was a valid payment.    *Scruggs* v. *Gass*, 8 Yerger, 175 ; *Bayard* v. *Shunk*, 1 Watts and Sergt. 92 ; *Lourey* v. *Murrell*, 2 Porter, 280.

From the foregoing views, we are of opinion that there is no error in the action of the court below, upon the instructions under consideration.

In coming to this conclusion we cannot disregard the fact that a vast amount of the rights and property of our citizens depends on contracts founded on considerations like that of the case before us ; nor can we overlook the circumstances under

which such contracts were made. The currency on which they were founded was, for upwards of four years, almost exclusively the circulating medium of the country—issued by governments having, in fact, complete power over the people, and exercising undisturbed political functions. It was the representative of their rights and property in all pecuniary transactions of a private character, and was, at the time, valuable and convertible into gold or silver to a considerable value. It answered all the purposes of a circulating medium among the people, and immense interests were acquired by means of it, under circumstances of the greatest good faith by both parties, and of large profit to the parties who received it; contracts of the highest obligation were entered into in consideration of it, and by it food and clothing and other absolute necessaries were obtained.

Under such circumstances, to hold that all such contracts were illegal and void, and that the parties acquired no legal rights under them, would be alike contrary to settled rules of law and to sound public policy.

The next objection raised to the rulings of the court is that the Mississippi treasury notes were *bills of credit*, and void under section 10, of article 1, of the Constitution of the United States; and, to the extent of the amount of them involved in this case, that they could not constitute a lawful consideration for the contract sued on. This objection is based on the authority of *Craig* v. *State of Missouri*, 4 Peters.

If it be conceded that, at the time these notes were issued, the Constitution of the United States was in actual force in this State, and that the powers of this State were governed by it, in the peculiar circumstances of its condition at the time, yet it is clear that these notes are not embraced within the prohibition of that constitution.

They were issued under the ordinance of the State convention of 26th January, 1861, which authorized them to be issued solely on a loan of money to the State, and as evidence to the individual of the indebtedness of the State for the loan. They were not authorized to be issued as a circulating medium, and that was not the policy contemplated by the measure. That

36

they were used among the people in part for that purpose, after they were issued, is true; but it is manifest from the ordinance that such was not the purpose for which they were authorized. They were not intended to be loaned or "emitted" *as currency*, but were given out to persons who loaned money to the State; and that is expressly decided, in the case of *Craig* v. *The State of Missouri*, not to be within the prohibition of the constitution. It is there held, that a contract executed by a State, by which she binds herself to pay money at a future day for services actually rendered, or for money borrowed for present use, is not a bill of credit within the meaning of the constitution.    4 Peters, 431, 432.    And it is clear that these notes were authorized to be issued for money borrowed by the State for present use, and for no other purpose.

A question appears to have been raised in the court below, as to the validity of the notes referred to as "cotton money" issued by this State, and as to the right and power of the State to issue them.    But that question has been waived by the counsel for the plaintiffs in error here; and nothing we have said above is to be considered as an intimation of an opinion on that point.

The last ground of error insisted on is the *sixth* instruction given by the court at the instance of the plaintiff.

This instruction, as it appears in the record, is unintelligible, and some of the words of it would appear to have been omitted in transcribing it.    As stated in the record, it declares no rule which could have misled the jury, or worked to the defendants' prejudice.    We cannot, therefore, determine whether the instruction as given was correct or not.

But, as well as we are able to understand it, it appears to be immaterial, when considered with reference to the facts of the case and the verdict of the jury, under the view we have taken of the leading features of the case; and it could not have worked to the prejudice of the defendants.

As stated by counsel, it had reference to certain accounts of the plaintiff against the defendants, severally as well as jointly, which the defendants had agreed, before the accounts were con-

tracted, should be taken when contracted, as credits on the note set up by them as a set-off. The plaintiff testified that these accounts were due annually, from the year 1858 to May, 1862, amounting to the aggregate sum of $1,263, as stated in his bill of particulars filed with his declaration; that his books and accounts had been destroyed by fire in 1863, and he was unable to give the items of the accounts, or to state what was the amount of each account annually against the defendants, or either of them, but that he confidently believed he had rendered them annually to the defendants, and they made no objection to them; that he took the aggregate amount from a memorandum book which he had kept, which was the only means he had of stating it. Upon this the defendants produced to him, on the trial, several of the accounts rendered for the years 1858 and 1861, amounting to about the sum of $525, and stated their belief that none others had been rendered.

The objection to the instruction is, that it authorized the jury to allow the plaintiff for the aggregate amount of these accounts, although the particulars of several of them were not specified or proved, which the defendants were entitled to under their agreement, and which was necessary in order to enable them to adjust the several sums between themselves.

If this view be correct, yet it does not appear, and is not probable, that the defendants were prejudiced by the instruction.

It appears that the balance due the defendants on the 1st January, 1862, on the note of the plaintiff, after deducting credits indorsed, and $450 which should have been credited on the note for error in the original amount, amounted to about $3,103.

| | |
|---|---|
| The value of the Confederate and cotton money at the value proved amounted to about | $1,100 |
| The State Treasury notes at $1,600, and the accounts produced, $525, | 2,125 |
| | $3,225 |

The verdict was for $218 for the defendants. It is not clear

upon what view of the several items presented this verdict is based. But under the view which the jury should have taken, and which we must presume they did take, of the matter of the funds deposited, their verdict, on that point, must have allowed credit to the plaintiff for about $2,700. The accounts produced, it must also be presumed, were allowed for $525. If they allowed credit for the $450, as they might have done on the evidence, that, added to the other credits, would have amounted to more than sufficient to pay the note set off by the defendants.

Upon the whole, it appears to us from the evidence, that there is nothing on this point in the verdict of which the plaintiff in error can complain.

The judgment must be affirmed.

HARRIS, J., delivered the following dissenting opinion:

I do not concur with the majority of the court in the opinion that the value of depreciated bank paper, left on special deposit with a banker, may be recovered of him *in an action for money had and received by the depositor as money.*

On the contrary, I hold, first, that under the count for money had and received, nothing but what the law regards as *money* can be recovered.

Second. That the word *money* means gold and silver, or the lawful circulating medium of the country, known, approved, and used in the market as *cash.*   Coke Lett., page 207 (*a*); 1 Johns. Ch. R. 235, *Mann* v. *Mann's Exrs.*

Third. That bank notes in legal contemplation are regarded as *money* so long, only, as they represent gold and silver. But when they cease to be the representative of gold and silver, and only pass from hand to hand, at a fluctuating depreciated rate, they are no longer regarded in law as money, but as a commodity, or property fluctuating in price, and not therefore possessing the quality of money as a standard of value.

Fourth. That uncurrent bank notes, received by a banker on special deposit as such, and not on general deposit as *money*, cannot be recovered as money in an action for money had and received by the depositor against the banker.

Fifth. That such uncurrent or depreciated bank paper constitutes a commodity when it possesses a market value, which is the subject of sale or exchange, and its value may be recovered, like other property, when wrongfully taken or withheld from the rightful owner; but is neither money nor the representative of money, unless made so by agreement of the parties, either express or implied.

Sixth. That the refusal to receive uncurrent or depreciated bank notes on *general* deposit by a banker, is equivalent to a refusal to receive or treat them as money, which cannot be negatived by the fact, that some, or even all other persons may receive and pass them at a depreciated rate, in the absence of any other currency.

Seventh. That such special deposits cannot be construed into an agreement to receive or treat them as *money*, but is evidence of a contrary understanding. ·

I concur in the opinion on the other parts discussed and decided.